IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

---

TOM BEU XIONG,

                            Plaintiff,                              OPINION & ORDER

    v.                                                            13-cv-418-jdp

JENNIFER A. FISCHER, in her official capacity,
DANE COUNTY, and DANE
COUNTY PROFESSIONAL SOCIAL WORKERS,
LOCAL 2634, AFSCME, AFL-CIO,

                            Defendants.

---

Plaintiff Tom Beu Xiong had been a social worker for defendant Dane County's Department of Human Services since 1990. Although apparently he had performed well for more than 20 years, in 2012, he was fired for serious work rule violations, job deficiencies, and for losing a state certification required for his job.

Xiong brings various contract and constitutional claims against Dane County and his supervisor, Jennifer Fischer, contending that his termination was illegal because it was procedurally defective and discriminatory. Xiong also brings claims against his union, Dane County Professional Social Workers, for failing to adequately represent him.

Before the court are the parties' cross-motions for summary judgment. Dane County and Fischer have moved for summary judgment on the claims against them, Dkt. 15, and the Union has moved for summary judgment on the claims against it, Dkt. 21. Xiong has moved for summary judgment on all of his claims. Dkt. 27. The court concludes that Xiong has failed to raise a genuine dispute as to any material fact pertaining to any of his claims. The evidence of record establishes that Xiong was fired for cause and that he received all the process he was due. He has not adduced any evidence that would support a reasonable inference that his termination was motivated even in part by discrimination. His union represented him

adequately, even though it declined to take his case to arbitration because his termination was plainly justified. The court will therefore deny Xiong's motion for summary judgment and grant defendants' motions.

## UNDISPUTED FACTS

We begin with a preliminary matter concerning the presentation of the summary judgment evidence. Defendants followed the court's required summary judgment procedure and submitted proposed findings of fact. Dkt. 16 (Union) and Dkt. 23 (Dane County and Fischer). Xiong submitted a single fact document that is both a response to defendants' facts and a set of supplemental facts. Dkt. 29. Xiong lists the defendants' facts that he agrees with, but he does not respond at all to a number of the defendants' facts. Presumably, Xiong intended to dispute those facts. But pursuant to the court's summary judgment procedure, if a non-moving party disputes a fact, the non-moving party must state its own version of the fact *and support that version with evidence*. Dkt. 10, Procedure To Be Followed On Motions For Summary Judgment, II.D. Xiong's non-response to certain of the defendants' facts is not sufficient to raise a genuine dispute. Accordingly, because all of defendants' proposed facts appear to be supported by admissible evidence, they will be accepted as undisputed. Xiong's supplemental proposed facts are accepted in those cases where they are admitted or where the defendants have not cited evidence to dispute them.

The parties are in substantial agreement concerning the historical facts in this case. Their disagreements, which are ultimately immaterial, are noted below.

## A.  Xiong's job duties and workplace conduct

Xiong is from Laos and identifies himself as Hmong. In 1990, Xiong began civil service employment as a social worker for the Dane County Department of Human Services. On June 1, 2012, he was fired. Xiong was a member of the Dane County Professional Social Workers, Local 2634, which had a collective bargaining agreement with Dane County. The agreement provided, among other things, that the Union would assist and represent employees throughout the pre-disciplinary, grievance, and termination processes.

Fischer was Xiong's immediate supervisor. Fischer had no major disciplinary concerns with Xiong until 2012. Xiong alleges, however, that shortly after Fischer became his supervisor in 2006, he began feeling as though she did not like him. Specifically, he identifies one instance of her making a comment during a staff meeting about Xiong being the only male in an office of females. He also recounts one instance of Fischer yelling at him over the phone because he missed an appointment with one of his clients, and one instance of her not responding to a greeting he offered.

Xiong's job duties included providing vocational training, residential assistance, and personal care to the elderly and individuals with disabilities. One responsibility—which Xiong himself described as "very important"—was to perform functional screens of clients to assess their ability to remain safely in their homes. To be qualified to perform these screens, social workers must pass a test and be certified. Failure to maintain certification prevents the social worker from being able to administer functional screens to clients.

Xiong successfully took the certification test at least five times during the course of his career. Xiong passed all of these, either on his first try or after receiving opportunities to retake the test. The past practice for employees who failed appears to have involved implementing a "plan of correction" and then allowing the employee to retake the test. In March 2012, however,

3

Xiong failed the certification test with a score of 67%. That year, Wisconsin's Department of Health Services (DHS) decided to alter its approach to failing scores. Individuals who scored below 80%—the passing score—but at least 70% had ninety days to complete a plan of correction and retake the test. Individuals who scored below 70% lost their certification and were not given the opportunity to complete a plan of correction. Because Xiong scored below 70%, DHS revoked his certification to perform functional screens. In response, Lynn Green, the Director of the Dane County Department of Human Services, wrote to DHS asking for an appeal procedure or other remedial measures to accommodate employees who scored below 70%. DHS denied her request.

Despite losing his certification, Xiong continued in his position. In the month after losing his ability to administer functional screens, however, Xiong had significant work rule violations and job performance deficiencies. In May 2012, Xiong forged Fischer's signature, at least twice, for paperwork he was preparing for an upcoming audit. Fischer investigated and found that Xiong had forged her signature on five other documents as well. On May 21st, Xiong approached Fischer and asked for the next two days off.[1] Fischer denied Xiong's request because she needed her employees present to prepare for an audit that week. Nevertheless, Xiong called in "sick" on both May 22nd and 23rd. On both days, he actually went to his second job at Oscar Meyer. Fischer investigated and found out that there had been four earlier dates on which Xiong had called in sick, but had used the time to attend his own divorce proceedings. Finally, Fischer discovered that earlier in 2012, Xiong had moved a client from one family home to another without documenting the change or updating country records as required.

---

[1] The parties dispute whether Xiong gave Fischer a reason for needing the time off. In 2012, Xiong went through a divorce, and he alleges that he asked for time off to attend his divorce proceedings. Defendants allege that Xiong asked for the time off so that he could go to his second job at Oscar Meyer. Ultimately, this dispute is immaterial; what matters is that Xiong requested time off and Fischer denied his request.

4

**B. Xiong's disciplinary process**

On May 22, 2012, Fischer wrote a letter to Xiong scheduling a meeting to discuss her concerns with his conduct. The letter identified six "issues to be discussed" as well as nine work rules Fischer believed Xiong's conduct may have violated. Fischer noted that the meeting could result in disciplinary action, up to and including termination, and advised Xiong that he had a right to have his union representative present. Fischer sent copies to her immediate supervisor, Theresa Sanders, as well as Sanders' supervisor, Fran Genter. Kate Gravel, Xiong's union representative, also received a copy, as did Green. Xiong alleges that he did not receive this letter until May 24th, the day of the meeting. He admits, however, that Gravel called him on May 23rd to discuss the allegations in the letter and whether Xiong wanted a Union representative with him at the meeting. Xiong and Gravel also met the following morning to prepare for the meeting.

On May 24th, Fischer held a pre-disciplinary meeting with Xiong. Also present were Sanders, Gravel, and Sue DeBuhr, a Union steward. Fischer and Sanders laid out their concerns with Xiong's behavior, specifically questioning him about the forged signatures, the unexcused absences to attend his second job and divorce proceedings, and his failure to document a client's move. Xiong admitted to each of their allegations. The meeting ended without Fischer or Sanders giving any indication as to the likely discipline Xiong would receive.

A week later, Fischer gave Xiong a letter informing him that he had been terminated. The letter summarized Xiong's pre-disciplinary meeting, discussed his work rule violations, and noted that by virtue of failing the certification test, he was no longer qualified for his position. The letter cited his violations and lack of qualification as grounds for his termination, and concluded by discussing the steps Xiong could take to appeal the decision. When the Union

learned of Dane County's decision, Gravel immediately asked Genter to consider options other than termination. Genter informed Gravel, however, that the decision had been made "far above him," and it was final.

Although the parties agree that Fischer drafted and signed Xiong's termination letter, they dispute the extent to which other supervisory personnel were involved in the decision to terminate him. At her deposition, Fischer testified that she consulted with an employee relations officer as well as with Sanders. She further testified that Genter reviewed the letter. Importantly, the parties' dispute centers on Green's involvement, which is relevant because Dane County's Civil Service Ordinance provides that only an "appointing authority" may discharge an employee. In this case, Green, as department head, was the appropriate "appointing authority." Green was copied on the letters scheduling the pre-disciplinary meeting and informing Xiong of his termination, but the record is unclear on whether Fischer herself communicated directly with Green before writing the letter.

Under the Union's collective bargaining agreement (CBA) with Dane County, employees may only be terminated or disciplined for good cause. The CBA sets out a four-step grievance procedure which allows employees to challenge adverse employment actions. Alternatively, employees may use the Dane County Civil Service Ordinance's appeals procedure. Both Fischer's letter and Union officials explained to Xiong that he could use either the CBA grievance process or the civil service appeal process, but not both. Xiong opted for the former.

The first step in the CBA grievance process is for the employee and a Union steward to take the grievance up orally with the employee's direct supervisor. If not resolved, the employee or the Union may advance the grievance to step two, which requires reducing the grievance to writing and presenting it to the department head—in this case, Green. If still not resolved, the employee or the Union may present the grievance to the County Executive or designee. Finally,

if dissatisfied with the County Executive's decision, the Union may take the matter to arbitration.

All agree that Xiong never went through steps one or two of the process. The defendants offer different explanations for bypassing the first two steps. The Union asserts that its common practice was to forgo steps one and two if the individuals hearing the grievance at those steps would be the same as those who had imposed the discipline. Dane County and Fischer contend that they were not obligated to offer steps one and two unless an employee or the Union requested them, which did not occur. In contrast, Xiong claims that the Union *did* request both steps and that the CBA *does* require Dane County to offer them, even if not requested.

Regardless of the reasons for bypassing steps one and two, Xiong had a step-three hearing before Travis Myren, the county's Chief Administrative Officer and Director of Administration. At the hearing, the Union requested that Xiong be suspended instead of terminated, pointing out that Xiong's misconduct occurred while he was under personal distress from his divorce. In response, Dane County expressed its concern that suspending Xiong would not make sense, given that he failed his certification test and was no longer qualified to work as a social worker. Myren denied Xiong's grievance, citing Xiong's lack of certification and forgery of several documents as reasons for upholding his termination. Myren noted that Xiong's forgeries dated back to 2010, well before he began having personal problems, and that these infractions represented "a gross violation of trust" that needed to "be treated with the highest degree of severity."

Following the step-three hearing, the Union board met with Xiong to discuss taking his grievance to arbitration. Ultimately, the Union board made the unanimous decision not to pursue arbitration, concluding that Xiong had violated not only work rules, but possibly criminal laws and other requirements applicable to social workers. Despite choosing not to

pursue the grievance further, the Union was able to persuade Dane County to offer Xiong a severance package which extended his health care benefits on the condition that he resign and drop his grievance. Xiong rejected this offer.

Throughout the grievance process, Xiong expressed his satisfaction and appreciation for the Union's efforts. He admitted that the Union adequately presented his case and that he had a full and fair opportunity to explain his position at both his step-three hearing and his meeting with the Union board.

OPINION

Summary judgment is appropriate if a moving party "shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). To avoid summary judgment, the opposing party "must set forth specific facts showing that there is a genuine issue for trial." *Id.* A party may not simply rely on the allegations in its pleadings to create such a dispute, but must "demonstrate that the record, taken as a whole, could permit a rational finder of fact to rule in [its] favor." *Johnson v. City of Fort Wayne, Ind.*, 91 F.3d 922, 931 (7th Cir. 1996).

That the parties have filed cross-motions does not necessarily require the court to grant summary judgment for one party or the other. Instead, the court "look[s] to the burden of proof that each party would bear on an issue of trial; [and] then require[s] that party to go beyond the pleadings and affirmatively to establish a genuine issue of material fact" as to that issue. *Santaella v. Metro. Life Ins. Co.*, 123 F.3d 456, 461 (7th Cir. 1997). Here, the party bearing the burden at trial on all claims would be Xiong. But Xiong has not adduced evidence to create a

genuine dispute as to any material fact. The few disagreements in the parties' versions of the events are immaterial, and Xiong has not shown that trial is necessary on any of his claims.

## A. Summary judgment is appropriate on Xiong's claims against the Union.

### 1. The Union did not breach its duty of fair representation.

Xiong's first set of claims alleges that the Union failed to fulfill its duty to fairly represent him throughout the grievance process. A union violates its "duty of fair representation . . . only when [its] conduct toward a member of the collective bargaining unit is arbitrary, discriminatory, or in bad faith." *Vaca v. Sipes*, 386 U.S. 171, 190 (1967); *see also Neal v. Newspaper Holdings, Inc.*, 349 F.3d 363, 369 (7th Cir. 2003) (citing *Vaca*, 386 U.S. at 190).[2] Xiong does not argue that the Union acted discriminatorily or in bad faith; rather, he asserts that the Union's actions were arbitrary. Dkt. 28, at 16. Because Xiong has not produced anything from which a reasonable jury could agree that the Union acted arbitrarily, the court will grant summary judgment to the Union on Xiong's claim for breach of the duty of fair representation.

To evaluate whether the Union acted arbitrarily, the court must "inquir[e] into the objective adequacy of [its] action." *Trnka v. Local Union No. 688, United Auto., Aerospace & Agric. Implement Workers of Am.*, 30 F.3d 60, 63 (7th Cir. 1994); *see also McLeod v. Arrow Marine Transp., Inc.*, 258 F.3d 608, 613 (7th Cir. 2001) ("A union's actions are arbitrary only if, in light of the

---

[2] To recover money damages against the Union, Xiong must also show that he "was actually harmed by the union's actions." *Garcia v. Zenith Elecs. Corp.*, 58 F.3d 1171, 1176 (7th Cir. 1995); *see also Czosek v. O'Mara*, 397 U.S. 25, 29 (1970) ("[D]amages against the union for loss of employment are unrecoverable except to the extent that its refusal to handle the grievances added to the difficulty and expense of collecting from the employer."). As Xiong offers nothing to suggest the Union's actions were arbitrary, discriminatory, or in bad faith, the court need not address the extent to which he was harmed by the Union's actions and how much he can recover as a result.

factual and legal landscape at the time of the union's actions, the union's behavior is so far outside a wide range of reasonableness, as to be irrational.") (internal citations omitted). In handling a member's grievance, "[t]he union must provide some minimal investigation . . . but the thoroughness of this investigation depends on the particular case, and only an egregious disregard for union members' rights constitutes a breach of the union's duty." *McLeod*, 258 F.3d at 613 (internal citations omitted). Here, Xiong argues that the Union's failure to pursue steps one and two qualifies as an "egregious disregard" of his rights, as does its decision not to advance Xiong's grievance to arbitration. The court disagrees.

At the outset, Xiong faces an uphill battle because he admits that he was satisfied with the Union's representation and believed his representatives did their best to help him. Dkt. 29, at 1-2. To avoid summary judgment, however, Xiong now asserts that the Union should have insisted on hearings at steps one and two of the grievance process because these hearings would have provided him with an opportunity to explain his case to his supervisors. The problems with this argument are twofold. First, Xiong overlooks the fact that he was fired for forging his supervisor's signature on official documents and for calling in "sick" to attend his second job. Xiong admitted to these work rule violations during his pre-disciplinary meeting and does not now dispute that these were valid reasons for terminating him. Because "an employee cannot prevail on a fair representation claim based on the union's failure to process a grievance if the employee's claim lacks merit," Xiong's admissions of misconduct undermine his claims against the Union. *Ooley v. Schwitzer Div., Household Mfg. Inc.*, 961 F.2d 1293, 1304 (7th Cir. 1992). Moreover, the "explanation" he would have offered appears to simply emphasize his cooperation, full admission to work rule violations, and twenty-two years of incident-free employment. Dkt. 28, at 15. But these are the exact defenses that the Union offered in Xiong's defense at the step-three hearing before Myren. Dkt. 18-16. As the court already noted, Myren

10

rejected these defenses, concluding that Xiong's conduct amounted to "a gross violation of trust" and needed to "be treated with the highest degree of severity." To the extent Xiong argues that the result would have been different had he given this explanation at steps one or two, he offers nothing to support that notion beyond mere speculation.

A second and independent problem with Xiong's argument is that he largely ignores the rest of the record which demonstrates that the Union *did* represent him fairly and thoroughly. It is undisputed, for example, that Gravel and DeBuhr were in regular contact with Xiong throughout the disciplinary process. They met several times, both to discuss the allegations against him, and to prepare for various hearings and meetings. The Union also secured a severance package for Xiong to help mitigate the loss of his health insurance, and at each step of the process, asked different supervisors to consider lesser sanctions. Taken as a whole, Xiong simply has no evidence from which a jury could conclude that the Union disregarded his rights or failed to adequately represent him. Even if Xiong is correct that it would have been wiser for the Union to insist on steps one and two—and Xiong has offered nothing to demonstrate that this is so—he cannot show that in choosing to bypass these steps, the Union breached its duty of fair representation. *See United Steelworkers of Am., AFL-CIO-CLC v. Rawson*, 495 U.S. 362, 372-73 (1990) ("[M]ere negligence, even in the enforcement of a collective-bargaining agreement, [does] not state a claim for breach of the duty of fair representation."); *McKelvin v. E.J. Brach Corp.*, 124 F.3d 864, 867 (7th Cir. 1997) ("We will not substitute our judgment for that of the union, even if, with the benefit of hindsight, it appears that the union could have made a better call.") (internal citations omitted).

Xiong fares no better in taking issue with the Union's decision to not advance his grievance to arbitration. An employee does not have an absolute right to arbitration, nor does a union "breach its duty of fair representation, and thereby open up a suit by the employee for

11

breach of contract, merely because it settled the grievance short of arbitration." *Vaca*, 386 U.S. at 191-92. In deciding whether to take an employee's grievance to arbitration, "a union is accorded considerable discretion" and is free to "consider the merits of the case or the effect on the larger collective bargaining unit in making various strategic decisions during the grievance procedure." *Garcia*, 58 F.3d at 1176. This is exactly what the Union did in Xiong's case. After receiving Myren's decision, the Union's board met with Xiong and gave him a full opportunity to explain his position. Ultimately, however, the board made the unanimous decision to not pursue arbitration. In addition to considering the financial resources necessary for arbitration, the board also believed there was a low likelihood of success as Xiong's forgeries obviously violated work rules and may have been a crime or broken other legal requirements for social workers.

Xiong does not dispute any of this, but he argues that arbitration was "the only impartial and neutral process in the entire union grievance procedure." Dkt. 28, at 15. Xiong may be correct in this observation, insofar as the first three steps involve decision-makers who work for the employer. But he offers the court no authority suggesting that the opportunity to have a neutral decision-maker somehow imposes upon the Union an obligation to advance his grievance to arbitration. In fact, if the court were to accept that argument, it would effectively require arbitration for *all* employee grievances because steps one, two, and three will *always* be before Dane County personnel. Such a requirement would plainly contradict the well-settled rule that a "union is not obliged to take all member grievances to arbitration." *Neal*, 349 F.3d at 369; s*ee also Vaca*, 386 U.S. at 191 ("If the individual employee could compel arbitration of his grievance regardless of its merit, the settlement machinery provided by the contract would be substantially undermined.").

In sum, Xiong cannot dispute that the Union fulfilled its duty of fair representation. His arguments to the contrary find no support in the record or are foreclosed by law. Summary judgment for the Union is appropriate.

### 2. The Union is not a "person acting under color of state law" for purposes of 42 U.S.C. § 1983.

Xiong also alleges that the Union violated his constitutional right to due process when it prohibited him from submitting his grievance to arbitration, and thus he brings a claim against the Union under 42 U.S.C. § 1983. To state a claim under § 1983, "the plaintiff must allege that some person has deprived him of a federal right . . . [and] he must allege that the person who has deprived him of the right acted under color of state law." *Alvarado v. Litscher*, 267 F.3d 648, 651 (7th Cir. 2001) (citing *Gomez v. Toledo*, 446 U.S. 635, 640 (1980)). Here, the Union moves for summary judgment on Xiong's § 1983 claim because it is not a "person acting under color of state law." The Union's position is correct, which might explain why Xiong did not directly respond to the Union on this point.[3]

For the purposes of § 1983, the general rule is that "[u]nions are not state actors; they are private actors." *Hallinan v. Fraternal Order of Police of Chi. Lodge No. 7*, 570 F.3d 811, 815 (7th Cir. 2009). A union's conduct may nevertheless amount to "state action" if "there is such a close nexus between the state and the challenged action that seemingly private behavior reasonably may be treated as that of the state itself." *Id.* at 815-16. In this case, however, Xiong has not identified facts which could demonstrate such a nexus.

Xiong's complaint alleges that the Union and Dane County cooperated to create a grievance system that prevented the aggrieved employee from seeking arbitration on his own,

---

[3] The Union made this argument in its opening and reply briefs in support of its motion for summary judgment, Dkt. 17 and Dkt. 31, and in its opposition to Xiong's motion for summary judgment, Dkt. 35. Xiong directly responded to two of these briefs, and had the third—the Union's reply—before submitting his final brief.

thus depriving him of access to a neutral procedure that he could pursue without the Union. Although the CBA creates a grievance mechanism in which Dane County and the Union agree to participate, this jointly negotiated procedure falls short of establishing the necessary connection. *See, e.g., Leahy v. Bd. of Trs. of Cmty. Coll. Dist. No. 508*, 912 F.2d 917, 921 (7th Cir. 1990) (affirming dismissal where a plaintiff failed to "show that the Union, a private entity, was acting under color of state law when it refused to take his grievance . . . to arbitration"); *Jackson v. Temple Univ. of Com. Sys. of Higher Educ.*, 721 F.2d 931, 933 (3d Cir. 1983) (affirming summary judgment where a plaintiff failed "to set forth any facts suggesting that the state was responsible for the Union or that the Union was acting under color of state law in deciding not to bring [the plaintiff's] grievance to arbitration").

A second problem with Xiong's due process claim against the Union is that the CBA procedure was not mandatory. Xiong could have elected to pursue a civil service appeal instead of the CBA grievance process, and thus he could have pressed his appeal as far as he cared to without the Union's approval or assistance. Dkt. 25, at 14 (Dane County Civil Service Ordinance allowing a discharged employee to appeal his termination to the Dane County Civil Service Commission or use the grievance process in a collective bargaining agreement, but not both).

Ultimately, Xiong does not advance any viable theory that the Union qualifies as a person acting under color of state law, and the court's own review of the record confirms that no such theory could be sustained in this case. The Union is entitled to summary judgment on Xiong's § 1983 claims.

**B. Summary judgment is appropriate on Xiong's claims against Dane County and Fischer.**

A preliminary point, not addressed by the parties: Xiong has captioned the case as one against Fischer in her "official capacity." A suit against a government official in her official capacity is effectively a suit against the government entity itself, rather than against the official for her personal misdeeds. *See Kentucky v. Graham*, 473 U.S. 159, 165 (1985) ("Personal-capacity suits seek to impose personal liability upon a government official for actions he takes under color of state law . . . . Official-capacity suits, in contrast, generally represent only another way of pleading an action against an entity of which an officer is an agent.") (internal citations omitted). Official capacity claims against Fischer would be superfluous, because Dane County is itself a defendant. Despite the caption, however, Xiong's claims against Fischer actually appear to be directed at her individually, and the court will give Xiong the benefit of the doubt and construe his complaint as being directed at Fischer in her individual capacity.

**1.  Dane County and Fischer did not violate the CBA.**

Xiong's first claim against Dane County and Fischer is that they violated the CBA by not offering him steps one and two of the grievance process. This claim fails as a matter of law because Xiong cannot show that the Union breached its duty of fair representation. To succeed in an action for breach of a collective bargaining agreement, Xiong "must have a meritorious claim against *both* the union and the employer; the claims are interlocking in the sense that neither is viable if the other fails." *Neal*, 349 F.3d at 368 (emphasis added); *see also Thompson v. Aluminum Co. of Am.*, 276 F.3d 651, 657 (4th Cir. 2002) (citing *Vaca,* 386 U.S. at 186) ("[F]ederal courts review allegations against employers for breach of collective bargaining agreements *only* when an employee has first proved that the union representing him breached its duty of fair representation.") (original emphasis). As the court has explained, Xiong cannot show

15

that the Union's actions were arbitrary and amounted to a breach of its duty of fair representation, and so he cannot proceed against Dane County for a breach of the CBA.

Even if Xiong's claims were not foreclosed by law, the record does not provide anything from which he could genuinely dispute that Dane County's and Fischer's actions were proper. The CBA provides that at step one, "[t]he employee and the [union] steward shall take the grievance up orally with the employee's first line of supervision," and at step two, "[t]he grievance shall be considered settled in Step 1 unless within ten (10) days after the supervisor's answer is due, the grievance is reduced to writing and presented to the department head." Dkt. 18-1, at 10. Dane County and Fischer correctly observe that these provisions place the onus to initiate and continue the grievance procedure squarely on the employee and the Union.

Although Xiong contends that the Union actually asked for steps one and two, the deposition testimony to which he cites in no way supports his statement. Xiong cites the portion of Gravel's deposition that explains how the Union often "bypasses" steps one and two if the individuals to whom those steps direct the grievance have already been involved in the disciplinary decision. Dkt. 14, at 7. Gravel explains that in Xiong's case, step one would have involved a meeting with Fischer and step two would have involved a meeting with Green. As both of them had already participated in the decision to terminate Xiong, the Union decided to forgo steps one and two and begin the grievance process at step three.[4] *Id.* If anything, Gravel's testimony confirms that the Union never requested steps one and two, and Xiong offers no other support for his conclusion that Dane County or Fischer ever refused such a request.

---

[4] What Gravel testified was that "when we [the Union] have asked direct supervisors or directors, so in this case it *would have been* Jennifer Fischer or Lynn Green, about scheduling a grievance meeting, they've said, [w]e've already made those decisions. We're in agreement with the decisions that are made." Dkt. 14, at 7 (emphasis added). Gravel is explaining who the Union would have spoken to about steps one and two, and why such requests would not have made sense in this case. To the extent that Xiong interprets these statements as suggesting that the Union *actually asked* Fischer or Green for a hearing, he is mistaken.

16

Because both the record and the law prevent Xiong from succeeding on his claims against Dane County and Fischer for breach of the CBA, summary judgment is appropriate.

### 2. Dane County and Fischer did not violate Dane County's Civil Service Ordinance.

Xiong's second claim against Dane County and Fischer is that they did not comply with the ordinance that authorizes an "appointing authority" to terminate him. Section 18.13(1) of the Dane County Civil Service Ordinance provides that "[a]ny appointing authority may . . . discharge an employee."[5] Section 18.04(1) defines an "appointing authority [as] any county board, commission, committee, institution, agency, elected official, or department head that has been granted authority to hire employees in the county civil service." The parties agree that this is the ordinance authority under which civil service employees may be terminated and that Green was the relevant "appointing authority" in this case. Xiong's claim is that Fischer signed the letter informing him of his termination, not Green, and that Fischer's actions exceeded her authority in violation of the ordinance.

The parties provide little guidance concerning Dane County's obligations and Xiong's rights under Section 18.13(1). It would be an unreasonable interpretation of the ordinance to require that, as the appointing authority, a department head must single-handedly make and communicate every termination decision. But Dane County has not made it clear exactly what Green was obligated to do in this case. On the other hand, it is not immediately clear to the court that Xiong would have any remedy against Dane County or Fischer if Green somehow fell short on her responsibilities, especially when Xiong's firing appears to be well justified and carefully considered by Dane County. If an employee believes that his termination was not authorized by the proper appointing authority, that problem could be easily remedied in the

---

[5] References to the Dane County Civil Service Ordinance are to the version in effect at the time of Xiong's termination. *See* Dkt. 25.

grievance process. If the termination had been authorized by the appointing authority, that could be documented and made clear to the employee. If the termination were truly unauthorized, as Xiong alleges here, it could be reversed. In this case, it does not appear that Xiong raised this issue during the step-three hearing, when it could have been so readily addressed. The court would, therefore, be inclined to regard Xiong's claim as waived. Even if not waived, Xiong's claim fails because the record supports the defendants' position, which is that Green authorized Xiong's termination.

The defendants contend that Fischer did not *make* the ultimate decision to fire Xiong by herself; she merely *relayed* that final decision to him in the termination letter. The court agrees that Xiong has no claim against Dane County or Fischer based on the termination letter. Section 18.13(2) provides that "[w]henever an appointing authority decides to take action as provided in section 18.13(1), written notice of such action shall be . . . given to the employee within two (2) working days of the action being taken." The section does not require that the appointing authority herself give the employee notice, and Xiong offers no authority interpreting the ordinance as requiring that notice come directly from the appointing authority. Accordingly, Xiong has no claim based on the fact that Fischer signed and delivered the termination letter.

Instead, this claim turns on whether Green authorized the decision to terminate Xiong. The record is clear that she was copied on the letter scheduling the pre-disciplinary meeting, as well as the letter informing Xiong of his termination. The record is equally clear that Fischer consulted with Sanders, Genter, and the Dane County Employee Relations Department before drafting both letters. Further, Xiong admits that Genter told Gravel that the decision to terminate Xiong was made "far above him."[6] Dane County and Fischer also adduce an

---

[6] Green was Genter's supervisor, so this statement confirms that it was at least Green, or possibly someone higher, who made the decision to terminate Xiong.

"Employee Action Form," apparently completed by Dane County Human Services. Dkt. 37-1. In her deposition, Fischer identified the form as "a type of action termination/discharge," and stated that she did not prepare it. Dkt. 13, at 10. The document indicates that Xiong is being discharged, but the most relevant portion is the signature block at the bottom of the form, where an "appointing authority/designee" must sign. Although the signature is clearly not Green's, Xiong has no evidence to show that the signatory was not Green's lawful designee.

Xiong does not dispute any of this record evidence. His position, rather, is that the ordinance requires strict compliance with some formalities, which apparently means that Green alone must make the termination decision and that Green's termination decision must be documented in writing. But Xiong provides no support for this interpretation of the ordinance. He cites *Lawton v. Town of Barton*, 2005 WI App 16, 278 Wis. 2d 388, 692 N.W.2d 304, for the proposition that a termination made by one other than the "appointing authority" is void. That principle is valid, but the case does not support Xiong's strict interpretation of the Dane County Civil Service Ordinance. There, Lawton had been appointed to a town planning commission by Abel, the chairman of the town board and the "appointing authority" under the town's zoning ordinance. Lawton challenged her dismissal by the town board, which Abel had actively opposed. The trial court agreed with Lawton that the town board did not have the authority to remove her because that authority had been vested in Abel as the town chairman and the appointing officer. The court of appeals did not disturb that conclusion. *Lawton* would be on point if Fischer had terminated Xiong contrary to Green's instruction to retain him. But nothing in *Lawton* requires an appointing authority to render a termination decision in some particular written form, which is what Xiong appears to demand.

It would have been better practice for Dane County to document Green's approval of Xiong's termination. But the record evidence clearly shows that Fischer did not make the

decision to termination Xiong on her own. The termination decision had the express support of at least three levels of management above Fischer, and of the Dane County Employee Relations Department, and it had Green's support, at least tacitly. Xiong fails to adduce any evidence to support his contention that Fischer exceeded her authority under the Dane County Civil Service Ordinance and terminated Xiong without proper authorization. Dane County and Fischer are entitled to summary judgment on Xiong's ordinance violation claim.

### 3. Dane County and Fischer did not deprive Xiong of his Due Process rights.

Xiong's third claim against Dane County and Fischer is that they violated his right to procedural due process in failing to comply with the terms of the CBA and the Dane County Civil Service Ordinance. The court has already disposed of Xiong's direct claims that Dane County and Fischer failed to comply with the CBA and the Dane County Civil Service Ordinance, so Xiong's due process claim will fail if it simply repackages his other claims as constitutional violations. This is the case, at least in part: Xiong's due process claim largely rehashes his claim that Fischer exceeded her authority, and that claim is not viable.

The court will address only the new component of Xiong's due process claim, which is that he did not receive sufficient notice of the May 24th pre-disciplinary meeting. "An essential principle of due process is that a deprivation of life, liberty, or property be preceded by notice and opportunity for hearing appropriate to the nature of the case." *Cleveland Bd. of Educ. v. Loudermill*, 470 U.S. 532, 542 (1985) (internal citations omitted). To state a claim for violation of his due process rights, Xiong must first show that he was deprived of a protected property interest. *Wallace v. Tilley*, 41 F.3d 296, 299 (7th Cir. 1994). Dane County and Fischer do not dispute that Xiong had a property interest in maintaining his employment, and the court will assume that he has cleared this first hurdle. The Due Process Clause, however, "is not a guarantee against incorrect or ill-advised personnel decisions" and so the court must "focus [its]

20

inquiry on whether [Xiong] received *adequate* due process." *Wallace*, 41 F.3d at 299-300 (emphasis added).

Xiong argues that Fischer's May 22nd letter was not adequate notice. The court rejects this argument for two related reasons. The first is that no reasonable jury could find that his pre-disciplinary notice was inadequate. When an employee is on notice of his termination and has a chance to explain himself before the date of his firing, due process is satisfied. *See Chaney v. Suburban Bus Div. of Reg'l Transp. Auth.*, 52 F.3d 623, 630 (7th Cir. 1995). Xiong asserts that he only had "a few hour['s] notice" of the May 24th meeting, Dkt. 28, at 34, but the record directly contradicts this proposition. On May 23rd, through a phone call from his Union representative, Xiong received actual notice of his pre-disciplinary meeting. During that call, Gravel—who had read the letter scheduling the pre-disciplinary meeting—spoke with Xiong about the allegations surrounding his workplace conduct. Gravel's handwritten notes from that call confirm that she and Xiong specifically discussed the forged documents and the "sick" days when Xiong went to work at Oscar Meyer. Dkt. 18-4.

The second reason Xiong's argument fails is that he concedes he had adequate post-termination process, and "due process requires only abbreviated pre-termination processes where full post-deprivation processes are available." *Chaney*, 52 F.3d at 630 (internal citations omitted). Xiong admits, for example, that he had a full opportunity to explain his situation to Myren at his step-three hearing, and that the Union presented his case thoroughly throughout his grievance. The record also confirms that Fischer and the Union fully explained Xiong's appeal options under the civil service ordinance but that he chose to utilize the CBA procedures instead. To the extent that he did not have access to arbitration, that decision was a product of the Union's reasonable decision-making, not Dane County's or Fischer's. The post-termination process was more than adequate in this case, particularly given the fact that Xiong admitted

throughout that he committed serious work rule violations. Moreover, the thoroughness of his post-termination process and the ample opportunities he had to challenge his termination belie any concern that his pre-termination notice was inadequate. There is no dispute that Xiong received notice of his pre-disciplinary meeting, that he knew of and admitted to the conduct which led to his termination, and that he had opportunities to explain his position throughout the grievance procedure. The court will therefore grant summary judgment in favor of Dane County and Fischer on Xiong's due process claims.

### 4. Dane County and Fischer did not violate Xiong's right to Equal Protection.

Xiong's final claim against Dane County and Fischer is that "Fischer's and Dane County's actions in Step 1 and 2 of the union agreement grievance procedures may have been based on discriminatory impact against [Xiong]." Dkt. 1-2, ¶ 40. In his brief, Xiong concedes that his Equal Protection claim is underdeveloped, but suggests that he "intends to do more discover[y]." Dkt. 28, at 36. This suggestion is insufficient. Xiong has waived his equal protection claim by failing to develop an adequate argument for it. *See Brunner v. McKillip*, 488 F. Supp. 2d 775, 779 (W.D. Wis. 2007) ("Because [the plaintiff] has not developed [her] claims, they have been waived and defendants' motion for summary judgment will be granted with respect to them.") (citing *Cent. States, Se. & Sw. Areas Pension Fund v. Midwest Motor Express, Inc.,* 181 F.3d 799, 808 (7th Cir. 1999)).

Xiong's equal protection claim also lacks evidentiary support. Xiong and his immediate supervisor have both been deposed. If there was evidence of discrimination to add to the record, these two depositions likely would have revealed it. As it stands, the record simply does not contain anything by which a reasonable jury could conclude Xiong's termination had either a discriminatory purpose or effect. Xiong's proffered evidence of discriminatory animus consists of one comment about Xiong being the only male employee in the office, one instance where his

supervisor raised her voice, and one instance where his supervisor did not respond to his greeting. In the six years Fischer was Xiong's supervisor, and in the twenty-two years Xiong worked for Dane County, he has offered no other examples of discrimination. In fact, Xiong has admitted that Fischer never said anything to him about being male or Asian. Dkt. 12-2, at 3. The summary judgment stage is not the time to suggest that you will do additional discovery, it "is the 'put up or shut up' moment in a lawsuit, when a party must show what evidence it has that would convince a trier of fact to accept its version of events." *Johnson v. Cambridge Indus., Inc.*, 325 F.3d 892, 901 (7th Cir. 2003). Xiong has offered nothing in support of his Equal Protection claim, and Dane County and Fischer are entitled to summary judgment.

ORDER

IT IS ORDERED that:

1) Plaintiff's motion for summary judgment, Dkt. 27, is DENIED;

2) Defendants' motions for summary judgment, Dkt. 15 and Dkt. 21, are GRANTED;

3) The clerk of court is directed to enter judgment in favor of defendants and close this case.

Entered this 17th day of June, 2014.

BY THE COURT:
/s/
JAMES D. PETERSON
District Judge

23